**MAREK, Appellee,**

v.

**MAREK, Appellant.**

[Cite as *Marek v. Marek,* 158 Ohio App.3d 750, 2004-Ohio-5556.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 21886.

Decided Oct. 20, 2004.

Thomas M. McNerney and Leslie Weiss, for appellee.

Marie T. Smythe and Toni M. Richmond, for appellant.

---

BATCHELDER, Judge.

{¶ 1} Appellant, Robert D. Marek Jr., appeals from a decision of the Summit County Court of Common Pleas, Domestic Relations Division, which ordered payment of child support and arrearages and apportioned responsibility for uninsured health care. We reverse.

## I

{¶ 2} Marek has two ex-wives and seven children. He was married to his first ex-wife, Larraine, from circa 1976 until divorce in 1992, and has four children with her, ages 27, 25, 18, and five. He was then married to his second ex-wife, Lori, from 1993 until divorce in 2003, and has three children with her, ages eight, five, and three. Marek's youngest child with first ex-wife Larraine was born in the midst of his marriage to Lori and was likely a cause of his second divorce. This contentious second divorce fostered the litigation underlying this appeal, litigation during which neither party has been entirely forthright, to put it mildly.

{¶ 3} Shortly after his divorce from Larraine in 1992, Marek incorporated MBE Trucking, Inc., making himself the sole owner and operator. He married Lori in 1993, and the two of them operated the business together until their marital difficulties. Essentially, MBE operates large, off-road dump trucks at construction sites, as an independent contractor. However, for all practical purposes, Marek is far from independent. When starting his company, Marek

lacked the financial ability to purchase or lease these dump trucks on his own, so he entered an agreement with Anthony Allega (d.b.a. Allega Construction, Cuyahoga Leasing, or Mid–America Trucking). Under this agreement, Allega provided the trucks and offered cash advances to MBE as needed to sustain its operations. In return, MBE worked exclusively at Allega's direction, performing jobs only when and where Allega so instructed. Fees for these jobs were paid to Allega directly, and Allega credited that amount toward MBE's truck leases or cash advances. Any revenues over and above the truck lease or advances would flow to MBE as income. That rarely happened. Rather, MBE operated at a perpetual loss, increasing its debt to nearly $100,000 when Allega stopped this free-fall and retrieved his trucks, in effect putting MBE out of business and placing the obligation for the debt on Marek personally.

{¶ 4} Another man might have abandoned this business much earlier and prudently cut his losses while the debt was still manageable. But Marek seems to have enjoyed the benefits of self-employment, and he funneled certain personal expenses through the company, such as health insurance, home insurance, car insurance, car fuel, and car payments, including a car for his ex-wife Larraine. With these perks and rising personal credit-card debt, Marek and Lori were able to maintain their standard of living without significant effort. Yet their financial and personal relationships were deteriorating.

{¶ 5} In January 2001, Lori filed for divorce and moved for several orders. A magistrate heard the motions and granted temporary orders, including orders for spousal and child support. Meanwhile, Marek was repairing his relationship with Allega, who had returned to him the use of one truck so that he could continue to earn money to pay off his debt.

{¶ 6} In 2002, Marek filed for bankruptcy, thereby absolving himself of his debts (not including child support), but thereafter reaffirmed his immense debt to Allega, and has explained that he would have been blackballed from the construction business otherwise. Between the time of his bankruptcy and the hearing on his divorce, Marek managed to reduce his debt to Allega from approximately $94,000 to $47,000, although he correspondingly claimed very little personal income and at times received unemployment compensation from the state.

{¶ 7} In March 2003, after almost two years of bitter negotiation, the trial court conducted a hearing, entered the divorce settlement into the record, and granted the divorce, while withholding decision on three outstanding issues: arrearages from the temporary orders, the determination of child support, and the allocation of health-care cost responsibilities. In sum, the settlement granted Lori 50 percent ownership in MBE, split the value of the home (which resulted in $400 each after the foreclosure sale), allowed Lori to keep her entire IRA (approximately $6,000), gave each party one of their two boats, gave Lori a 1987

Dodge automobile, and gave Marek certain deer heads, mounted fowl, a lawn mower, and a snow blower. The court did not award any spousal support.

{¶ 8} In April 2003, the trial court conducted a hearing on the child-support arrearages arising from the temporary orders, the determination of permanent child support, and the allocation of health-care cost responsibilities. Significant evidence was entered into the record, and both parties testified. The two viewpoints present drastically different images. Lori depicts Marek as a schemer with secret income in excess of $100,000 per year, who is simply shirking his responsibilities in order to spite her. However, in reading her testimony, we note that she repeatedly contradicts herself, makes implausible allegations, and willingly misleads for effect. Marek's testimony depicts a desolate man who drives a 1979 Chevy Blazer, sleeps on his ex-wife's couch, borrows $17 a week from his adult son so that he can go bowling, and was refused a job at Burger King. Since filing for bankruptcy, Marek reduced his debt to Allega considerably, so it appears that Marek had been working and MBE was capable of generating cash. Thus, in reviewing the record, we recognize that Marek continued to operate MBE in some form, at least to appease Allega by reducing his substantial debt. We also note that Marek was less than forthcoming about his financial status throughout the process.

{¶ 9} In formalizing its decisions in a December 19, 2003 judgment entry, the trial court made several findings of fact before issuing the order, including the following: Marek is in arrears on the temporary child-support payments; Lori is unemployed, as she is attending nursing school; Marek is unemployed, but has been pursuing a part-time job; Marek has a commercial driver's license ("CDL"), so he is capable of working in that field; and neither party has health insurance. Therefore, the trial court (1) awarded Lori $21,037.95 in arrearages, (2) found Marek to be voluntarily unemployed, imputed to him an annual income of $37,440, and awarded child support of $296.57 per child, per month, and (3) determined that out-of-pocket health-care expenses in excess of $100 per child, per year, be paid 100 percent by Marek.

{¶ 10} Marek appeals from the trial court's order. He asserts three assignments of error for review.

## II

### A

### First Assignment of Error

The trial court erred and committed an abuse of discretion in basing Marek's child support order on the basis of the fact that he is in possession of a CDI; in effect finding him to be voluntarily underemployed.

{¶ 11} Marek asserts that the trial court erred by finding him voluntarily unemployed and imputing income for purposes of calculating child support. Specifically, Marek argues that he is not actually unemployed because he continues to run MBE; that even if deemed unemployed, he is not voluntarily unemployed because he has actively been seeking another job; and that even if deemed voluntarily unemployed, his mere possession of a CDL does not justify the income amount imputed. We agree.

{¶ 12} Decisions regarding child-support obligations are within the discretion of the trial court and will not be disturbed without an abuse of discretion. *Rock v. Cabral* (1993), 67 Ohio St.3d 108, 616 N.E.2d 218, syllabus. An abuse of discretion is "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. It is a "perversity of will, passion, prejudice, partiality, or moral delinquency." *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 621, 614 N.E.2d 748. When applying the abuse-of-discretion standard, an appellate court may not merely substitute its judgment for that of the trial court. Id.

{¶ 13} Because Lori filed her complaint for divorce on January 9, 2001, former R.C. 3113.215 governs the procedure for calculating and awarding child support. 2000 H.B. No. 495, 148 Ohio Laws, Part III, 5319. Although R.C. 3113.215 was repealed and replaced by R.C. 3119.01 et seq., effective March 22, 2001, this court reviews the calculation and award of support based on the statute in effect at the time of the filing. See *Williams v. Williams* (1992), 80 Ohio App.3d 477, 482, 609 N.E.2d 617. Under the provisions of R.C. 3113.215, a trial court determines the amount of the obligor's child-support obligation in accordance with the child-support schedule set forth at R.C. 3113.215(D) and the applicable model worksheet at R.C. 3113.215(E) or (F). R.C. 3113.215(B)(1). Generally, this involves calculations based on actual income; however, potential income may be imputed when the obligor is voluntarily unemployed or underemployed. R.C. 3113.215(A)(1)(b) and (A)(5)(a).

{¶ 14} Regarding voluntary unemployment and imputed earnings, R.C. 3113.215(A)(5) "clearly contemplates a finding by the trial court that the parent in question is voluntarily unemployed or voluntarily underemployed as a predicate to the subsequent exercise of the court's discretion in imputing income." *Ritchhart v. Phillips* (July 24, 1991), 4th Dist. No. 1725, 1991 WL 136742 (the trial court abused its discretion by imputing income without first finding that the party was voluntarily unemployed or underemployed), citing *Parkins v. Parkins* (Jan. 24, 1990), 3rd Dist. No. 5–88–18, 1990 WL 7956. See, also, *Wallake v. Wallake* (Aug. 5, 1997), 10th Dist. No. 96APF12–1620, 1997 WL 447658 (instruct-

ing the trial court to consider potential income if it finds voluntary underemployment or unemployment). Therefore, upon finding, and only upon first finding, voluntary unemployment or underemployment by the obligor, the trial court may impute earnings under the statutorily prescribed procedure.

{¶ 15} The trial court explicitly deemed Marek to be voluntarily unemployed, without even a suggestion of underemployment. We conclude that the trial court did not consider any underemployment aspects of Marek's situation, and we will not take it upon ourselves to do so here. Rather, we will focus on the trial court's decision that Marek was voluntarily unemployed and further consider its associated calculations for imputing income.

{¶ 16} At the time of the hearing, the trial court found that Marek was voluntarily unemployed. Seemingly, this decision was based on testimonial and documentary evidence available at the hearing and contained in the record before the court, including the following: he had recently applied for other jobs; he is physically capable of working and has a CDL, suggesting that he is employable as a truck driver; he did not work in 2002 and collected $7,800 in unemployment compensation; he had no income in 2003, as of the hearing in April; and he had subcontracted his trucks supplied by Allega to his son's business, MBB Trucking, Inc. Contrary evidence in the record includes testimony from both parties that Marek continued to operate MBE, or possibly MBB as a surrogate, with all revenues directed towards paying off the debt to Allega. Moreover, Marek testified that even with a CDL, he was unlikely to be hired as a truck driver, especially with his five traffic violations. Finally, that he was targeting low-paying, part-time jobs at a softball field or fast-food restaurant fits with the character of a person actively operating MBE during the day and unable to get a better-paying job driving trucks for another company.

{¶ 17} While we may disagree with the trial court's finding, our standard of review is whether an abuse of discretion occurred, and, therefore, we cannot merely substitute our judgment for that of the trial court. See *Pons*, 66 Ohio St.3d at 621, 614 N.E.2d 748. Viewing the evidence as a whole, we are not convinced that the trial court abused its discretion in this instance by deeming Marek voluntarily unemployed. Also, upon a full review of the record, we are further persuaded by the finding that Marek is living with his ex-wife Larraine, which absolves him of ordinary living expenses and suggests the type of case in which an obligor's true income is unclear because he or she has the luxury of working a job that pays no personal income. See *Julian v. Julian*, 9th Dist. No. 21616, 2004-Ohio-1430, 2004 WL 574161, at ¶ 15–17 (Carr, J., dissenting). Based on this finding of voluntary unemployment, it would be appropriate for the trial court to impute earnings in accordance with the statutory provisions.

{¶ 18} "In computing child support in accordance with the provisions of R.C. 3113.215, a trial court must determine the annual income of each of the child's parents." *Rock,* 67 Ohio St.3d at 110, 616 N.E.2d 218. See, also, *Adams v. Adams,* 9th Dist. No. 21775, 2004-Ohio-3563, 2004 WL 1496839, at ¶ 7. The trial court found that Lori was also unemployed, the reason being that she is in nursing school full-time. "The parent's subjective motivations for being *voluntarily* unemployed or underemployed play no part in the determination whether potential income is to be imputed to that parent in calculating his or her support obligation." (Emphasis sic; footnote omitted.) *Rock,* 67 Ohio St.3d at 111, 616 N.E.2d 218. Despite the finding that Lori is unemployed and the stated law that subjective motivations are irrelevant, the court did not impute any earnings to Lori in its child-support calculations. We infer that the court's finding that Lori receives means-tested public assistance necessarily negates a finding of voluntariness. Based on this inference, we find this a reasonable conclusion, and failure to impute income to Lori was not an abuse of discretion.

{¶ 19} Finally, we consider the trial court's calculations of the imputed earnings. The statute provides specific factors that the court must consider in imputing earnings:

> Imputed income that the court or agency determines the parent would have earned if fully employed *as determined from* the parent's employment potential and probable earnings based on [1] the parent's recent work history, [2] the parent's occupational qualifications, and [3] the prevailing job opportunities and salary levels in the community in which the parent resides.

(Emphasis and numerals added.) R.C. 3113.215(A)(5)(a). Courts have consistently held that consideration of these factors is a necessary requirement to imputing income, even after a determination that the parent's unemployed or underemployed status is voluntary. See, e.g., *Zahn v. Zahn,* 9th Dist. Nos. 21879 and 21880, 2004-Ohio-4881, 2004 WL 2050526, at ¶ 12–13; *Wallake, supra; Marsh v. Marsh* (1995), 105 Ohio App.3d 747, 751, 664 N.E.2d 1353; *Rock,* 67 Ohio St.3d at 111, 616 N.E.2d 218.

{¶ 20} In its December 19, 2003 judgment entry, the trial court presented three pages of an attempted financial analysis of Marek's business and personal income from 1999 to 2001, which in effect concluded with an opinion that Marek was no longer operating the business. The purpose of this effort is not clear, as the court then calculated imputed income based on a wholly unrelated set of assumptions. Before we proceed along the lines of the trial court's actual approach, we pause to note that the trial court's attempted financial analysis would appear to be completely unnecessary. In April 2001, Lori had moved for an independent business evaluation of MBE, and within days the magistrate had ordered that this business evaluation be conducted; however, there is no such

evaluation contained in the record, nor any explanation for its absence. An independent business evaluation would have provided the trial court with the financial analysis it struggled towards producing itself. Furthermore, Marek filed for bankruptcy in June 2002 and presented his financial condition to the bankruptcy court, which approved it and declared him bankrupt.

{¶ 21} In actuality, the court ignored its attempted financial analysis of MBE and just imputed the income that Marek might earn as a laborer. That is, the court considered what Marek could earn if he gave up his business and drove a truck for someone else, stating:

[Marek] testified however that he has a CDL license and could earn $18.00 an hour full time as a truck driver. This projects to annual income of $37,440.00 per year if he was employed as a truck driver as opposed to being an independent truck driver. There was no evidence presented at trial to indicate that work as an employed truck driver was not available to [Marek] in this geographic area. [Marek's] only testimony was that he had five traffic violations and could not drive [a] truck as a result.

As the trial court makes much of the evidence not presented and limitations to Marek's testimony, we will briefly recap the actual testimony on this issue, which is the only evidence contained in the entire record on this issue:

[On Redirect Examination]

[Question by Mr. Marek's Attorney]: Do you have a CDL?

[Answer by Mr. Marek]: Yes, I do.

Q.: Allega employs company drivers that have a CDL?

A.: Yes, he did.

Q.: What do the company drivers commonly earn?

A.: They're probably eighteen, nineteen bucks an hour.

Q.: And how many hours a year do they work? Are they full time?

A.: Yeah. They their contract is May until November, so whatever that is.

Q.: May, June, July, August, September, October, November. They work seven months?

[Objected to and Overruled]

Q.: Why can't you be a company driver?

A.: For one thing, he doesn't have no openings or anything. After two violations, you can't drive.

Q.: How many violations do you have?

A.: I have five at the moment. I had four last year.

THE COURT: Recross?

[Recross–Examination by Lori's Attorney]

Q. [Lori's Attorney]: Do you have any documents to prove that the information you just testified to is true and accurate as far as income?

A. [Mr. Marek]: The documents as to what?

Q.: Documents reflecting that's the rate of pay for those construction drivers.

A.: I'm just guessing what they are.

[Lori's Attorney]: Okay. No further questions.

THE COURT: Any other?

[Marek's Attorney]: No.

Thus, solely from this brief exchange the trial court concluded that Marek could earn $18 an hour, which projects to an annual income of $37,440; that no evidence was presented to indicate that such work was unavailable; and that his only contrary testimony was his unsubstantiated statement that he could not drive because he had five traffic violations.

{¶ 22} This court has previously held that it is improper to calculate imputed earnings by merely extrapolating an hourly wage over a full-time basis. See *Arnott v. Arnott*, 9th Dist. No. 21291, 2003-Ohio-2152, 2003 WL 1983819, at ¶ 15. We find that approach especially troublesome in this case, where the hourly wage is based on the defendant's rough guess, elicited by his own attorney, and challenged by the opposing attorney; the same testimony explains that the work season is only seven months; and the defendant expressly testifies that the wage would not apply to him.

{¶ 23} Furthermore, as stated above, the statute provides specific factors a court must consider in imputing earnings: (1) the recent work history, (2) the occupational qualifications, and (3) the prevailing job opportunities and salary levels in the community. R.C. 3113.215(A)(5)(a). As to recent work history, since circa 1989, Marek had been managing MBE, albeit poorly, but he had not been operating trucks. This recent work history was seemingly ignored. As to occupational qualifications, Marek had a CDL, but his ability to use it was inhibited by his multiple traffic violations. While the trial court deems these traffic violations to be voluntary, this does not change the fact that they would prevent him from getting a job requiring a CDL. Cf. *Brennan v. Brennan* (May 1, 1998), 6th Dist. No. E–97–133, 1998 WL 230567 (finding abuse of discretion to impute full-time wage to one who has an employment handicap). Similarly, merely possessing a CDL does not entitle one to a job without consideration of other qualifications, such as experience, training, reliability, or compatibility with other workers or the workplace. We do not suggest that these qualifications must be considered in all cases, but note them only to emphasize that nothing was considered beyond Marek's mere possession of the CDL. Finally, the only

evidence of salary levels and prevailing job opportunities was Marek's own admittedly speculative guess as to drivers' wages followed by his insistence that there were no opportunities at the company he was referring to. This is not the type of analysis envisioned by the statute or our prior case law. See R.C. 3113.215(A)(5)(a); *Zahn*, supra; *Wallake*, supra; *Marsh*, 105 Ohio App.3d at 751, 664 N.E.2d 1353; *Rock*, 67 Ohio St.3d at 112, 616 N.E.2d 218.

{¶ 24} We must conclude that by failing to apply the statutory test, the trial court abused its discretion when it imputed an income of $37,440 to Marek for the purpose of calculating his child support obligation.

{¶ 25} Marek's first assignment of error is sustained.

B

### Second Assignment of Error

The trial court erred and committed an abuse of discretion in attributing $21,037.95 in arrearages to appellant through March 31, 2003.

{¶ 26} Marek asserts that the trial court erred by awarding $21,037.95 in arrearages, where the only evidence of that amount was the testimony by Lori, the impending beneficiary of an award. We agree.

{¶ 27} The only evidence to support the amount granted ($21,037.95) is the testimony of Lori during the hearing. According to her testimony, she relied on the Summit County Child Support Enforcement Agency ("CSEA") payment history statement. However, even that document, as contained in the record and as provided to this court as an attachment to Lori's brief, depicts a different value ($21,846.37). Based on this comparison, selection of $21,037.95 appears arbitrary. This award, without evidence, constitutes an abuse of discretion. See *Campbell v. Campbell* (1968), 17 Ohio App.2d 87, 46 O.O.2d 101, 244 N.E.2d 525, syllabus.

{¶ 28} However, in seeking to uncover a basis for the trial court's selection of this value, we discovered that even the amount depicted on the CSEA statement is unsustainable, as the magistrate did not follow the prevailing law in rendering the temporary orders that gave rise to the arrearages. As stated above, there are at least three steps to this process. Foremost, the trial court must find that the parent in question is voluntarily unemployed as a predicate to imputing income. *Ritchhart*, supra, citing *Parkins*, supra. When imputing income, the court must consider the income of each parent. *Rock*, 67 Ohio St.3d at 110, 616 N.E.2d 218. Finally, the trial court must consider specific factors when imputing earnings: work history, work qualification, and salary and work opportunities in the community. R.C. 3113.215(A)(5)(a); *Zahn; Wallake*, supra;

*Marsh,* 105 Ohio App.3d at 751, 664 N.E.2d 1353; *Rock,* 67 Ohio St.3d at 111, 616 N.E.2d 218.

{¶ 29} The CSEA statement depicts the monthly amount ordered, the amount paid for that particular month, and the running balance. Based on our review, we can separate the tally into three distinct time periods: from February 2001 to April 2001, Marek was charged $410.90 per month; from May 2001 to June 2002, he was charged $1,041.08 per month; and from June 2002 to February 2003, he was charged $1,245.22 per month. We will address each of these time periods in turn.

{¶ 30} Lori filed for divorce in January 2001 and moved for an order removing Marek from their home, designating her as the residential parent, and granting both spousal support and child support. In February 2001, a magistrate heard the motion and issued a temporary order. The magistrate determined that Lori was unemployed and that Marek was self-employed. Lori was designated the residential parent, with visitation allowed to Marek. Lori was granted possession of the house and use of a car.

{¶ 31} Because of a lack of specific information, the magistrate estimated and imputed Marek's income as $2,000 per month, based on a handwritten attachment in Marek's temporary hearing brief and the finding that MBE was operating only one truck. In response, Marek explained that $2,000 per month was the estimated gross earnings of the business when operating five trucks, and the amount could not reasonably be imputed to him for purposes of calculating child-support. Nevertheless, using this estimate and the statutory child-support worksheet, the magistrate ordered temporary child support of $151.42 per child, per month, and temporary spousal support of $100 per month, plus processing fees. Because Lori's youngest child had not yet been born, Marek was obligated to pay Lori $410.90 per month. This was the basis for the first of the three distinct time periods (February 2001 to April 2001).

{¶ 32} Because the magistrate specifically found that Marek was self-employed (i.e., not unemployed), it would have been inappropriate to impute income unless it first found him to be voluntarily underemployed. The magistrate made no such finding. Furthermore, despite explicitly stating that Lori was unemployed, the trial court did not determine whether she was voluntarily unemployed and therefore did not factor her potential voluntary unemployment into the child support calculations. Finally, the magistrate did not consider any of the required factors, but merely attributed a value it deemed appropriate based on Marek's description of his business ($2,000 per month; $24,000 per year). Because the magistrate failed to comport with the prevailing law, we must conclude that he abused his discretion when he imputed an income of $24,000 to Marek, for the purpose of calculating his child-support obligation.

{¶ 33} In viewing these calculations for the purpose of considering the arrearage due, we have the benefit of hindsight. Certain subsequent findings cause us to omit deductions for the preexisting child support to Larraine, which he was not paying anyway, as well as the briefly awarded spousal support to Lori, which was later deemed unjustified under the circumstances. Similarly, we incorporate the conclusion that Lori's unemployment was not voluntary, based on her receiving means-tested public assistance. Thus, we need look only to Marek's income to estimate the child support that should have been due. For the tax year 2001, Marek reported a personal adjusted gross income of $11,332 on his federal tax returns, which were prepared and signed by a certified public accountant ("CPA"). To deny this figure and attribute a figure of $24,000 is to implicate Marek and his CPA in a criminal conspiracy of federal tax fraud. This we will not do, at least based on the record before us. Rather, we look to R.C. 3113.215(D) and (E) for the appropriate child support. Using his reported income, we estimate this figure at $106.46 per month, per child, or $212.93 per month for the first of the three distinct time periods (February 2001 to April 2001).

{¶ 34} After the birth of Lori's youngest child in April 2001, the magistrate conducted a review hearing and issued a revised temporary order. The magistrate found that Marek was operating three trucks and therefore imputed earnings to him of $6,000 per month by multiplying by three the previous estimate of $2,000 per month for one truck. Despite finding that Lori was unemployed, no income was imputed to her because she was receiving means-tested public assistance. Using this estimate and the child-support worksheet, the magistrate ordered temporary child support of $340.22 per child, per month. The magistrate also terminated the temporary spousal support, demonstrating the uncertainty in the calculations by stating: "This is due to the Magistrate's recognition that the above child support obligation is based on massive amounts of information, very little of which has any use." All prior orders, which did not contradict this new order, were stated to remain in effect. At this point, Marek was obligated for $1,041.08 per month, for the second of the three distinct time periods (May 2001 through May 2002).

{¶ 35} Notably, Marek objected to these findings, explaining that even the original estimate of $2,000 per month was the estimated gross earnings of the *business* when *operating five trucks,* so $6,000 was grossly excessive. He argued that this did not represent his personal monthly income and could not reasonably be imputed to him for purposes of calculating child support. The trial court tersely denied this motion and adopted the magistrate's order.

{¶ 36} Just as before, the magistrate specifically found that Marek was self-employed, but imputed earnings anyway and then calculated the child support

accordingly. Therefore, without a finding that Marek was unemployed or underemployed, we must again conclude that he abused his discretion when he imputed an income of $72,000 to Marek. Again, we have the benefit of hindsight, and we omit deductions for the preexisting child support to Larraine, as well as spousal support to Lori. Thus, we need look only to Marek's income to estimate the child support that should have been due. For the tax year 2002, Marek reported zero personal income and received $7,800 in unemployment compensation. Furthermore, he filed for and was granted a personal bankruptcy during that year. To deny these income figures and attribute a figure of $72,000 would appear to implicate Marek and his attorney in a criminal conspiracy of unemployment compensation and bankruptcy fraud. This we will not do, at least based on the record before us. We also note that, just as we deemed it appropriate to find Lori not *voluntarily* unemployed based on her receipt of means-tested public assistance, so we deem it appropriate to find Marek not *voluntarily* unemployed based on his receipt of unemployment compensation. However, without Marek's moving for relief based on a change in circumstances, the prior income would theoretically remain in effect for child-support calculations: producing an estimate of $71.77 per child, per month, but for three children, or $215.31 for the second of the three distinct time periods (May 2001 through May 2002).

{¶ 37} In June 2002, the monthly amount due on the CSEA inexplicably increased. Notably, there are no corresponding court orders on the docket at this time nor any evidence of surrounding circumstances that would suggest a reason for this increase. At this point, Marek was obligated for $1,245.22 per month, for the third of the three distinct time periods (June 2002 to February 2003). However, without any basis to justify this change, it would appear that the prior amount would remain in effect: $215.31 per month.

{¶ 38} Based on the limited evidence in the record and our application of the table and worksheet scheme presented in R.C. 3113.215(D) and (E), we estimate Marek's child support obligation for the time period in question (February 2001 to March 2003) to be $5,590.92. Subtracting from this the amount Marek has paid, $4,081.20, results in an arrearage of $1,509.72. We recognize that on remand the trial court may solicit further evidence, including evidence to support a finding of voluntary underemployment and imputed earnings based on the statutory factors, and thereby calculate an entirely different yet supportable value. However, for our purpose here, a comparison of our calculated value ($1,509.72) with the trial court's seemingly arbitrary arrearages value ($21,037.95), a value almost 14 times greater, further persuades us that this is the type of unreasonable, arbitrary, or unconscionable order that constitutes an abuse of discretion.

{¶ 39} Marek's second assignment of error is sustained.

C

### Third Assignment of Error

The trial court erred in awarding 100% of the health care expense to appellant.

{¶ 40} Marek asserts that the trial court erred by failing to follow the statutory provision for attributing health-care costs, which requires that the division be equitable. Specifically, Marek argues that the division was not equitable because it imposes on him almost the entire amount. We agree.

{¶ 41} As stated above, decisions regarding child-support obligations are reviewed for abuse of discretion. *Rock*, 67 Ohio St.3d 108, 616 N.E.2d 218, syllabus. We review such decisions based on the statute in effect at the time of the filing. Cf. *Williams*, 80 Ohio App.3d at 482, 609 N.E.2d 617. Under the applicable provision of the statute in place at the time Lori filed for divorce, January 9, 2001, if neither parent has access to reasonable health insurance coverage,

the court shall determine the parent responsible for the health care of the children subject to the child support order and shall include in the order * * *

* * *

(3) * * * a requirement that the obligor and the obligee share liability for the cost of the medical and health care needs of the children, under an equitable formula established by the court * * *.

Former R.C. 3113.217(B)(3), 1997 Am.Sub.H.B. No. 352, 147 Ohio Laws, Part II, 2805–2807. In the temporary orders, the magistrate had concluded that health-are insurance was not available to either party and ordered that Lori pay 100 percent of out of pocket health-care expenses. The trial court similarly found that health-care insurance was not available to either (unemployed) parent, but reversed the responsibility and ordered: "Out-of-pocket health care expenses in excess of $100 per child per year shall be paid 0% by [Lori] and 100% by [Marek]."

{¶ 42} We have previously expressed our general disfavor for this form of distribution. See *Adams*, 2004-Ohio-3563 at ¶ 19–20. Our reasoning was that such a one-sided distribution, particularly between contentious parties, creates a disincentive for the obligee to minimize health-care expenses or apply for benefits from the state. Id. Although the present case contains no accusations of improper behavior by Lori regarding health-care expenses, it certainly contains a contentious, almost hostile, relationship between the parties, which warrants skepticism of the propriety of such an extreme distribution.

{¶ 43} Reviewing the divorce decree in its entirety, we note that the settlement granted Lori 50 percent ownership in the business and 50 percent of the home, allowed Lori to keep her $6,000 IRA, gave her a boat and a 1987 Dodge automobile, and awarded her residential parent status. Furthermore, the trial court's final order awarded Lori $21,037.95 in arrearages and $889.41 per month in child support, despite its explicit finding that Marek was unemployed and under significant debt. Finally, at the time of the order, Lori's three children were ages seven, four, and two. For children of these ages, there is certainly a significant likelihood that annual health-care expenses would far exceed $100 per child.

{¶ 44} With all of this as background, Marek contends that a formula that requires him to pay 100 percent of all health-care costs over $100 per child per year is inequitable and an abuse of discretion. We are compelled to agree. This sort of piling-on suggests the perversity of will, passion, prejudice, partiality, or moral delinquency that demonstrates an abuse of discretion. See *Pons,* 66 Ohio St.3d at 621, 614 N.E.2d 748.

{¶ 45} Marek's third assignment of error is sustained.

### III

{¶ 46} Each of Marek's three assignments of error is sustained. The judgment of the Summit County Court of Common Pleas, Domestic Relations Division, is reversed and the cause is remanded for further proceedings consistent with this opinion.

Judgment reversed
and cause remanded.

BOYLE, J., concurs.

CARR, P.J., dissents.

CARR, Presiding Judge, dissenting.

{¶ 47} I respectfully dissent as I feel the trial court did not abuse its discretion here.