[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
[1] We have sua sponte consolidated the appeal in the case numbered C-030773 with the appeal in the case numbered C-030747.
 DECISION.
{¶ 1} Plaintiff-appellee/cross-appellant Susan Sutphin and defendantappellant/cross-appellee Stuart B. Sutphin III[2]
were married in 1987. The Sutphins separated in 1998. In 2001, Susan filed a complaint for divorce, and Stuart filed a counterclaim for divorce.
 {¶ 2} A magistrate of the domestic relations court held a trial on the claims in June 2002. In January 2003, the magistrate issued his decision, including findings of fact and conclusions of law. The magistrate granted Stuart's motion to strike the testimony of one of Susan's expert witnesses, ordered Stuart to pay as spousal support his share in the marital home and $5,000 per month for a five-year period, and further ordered him to contribute $20,000 toward Susan's legal fees.
 {¶ 3} Following objections by both parties, the trial court modified the magistrate's decision. The court sustained Susan's objection to the striking of the testimony of Susan's expert witness. The court ordered Stuart to pay as spousal support a sum of $1,415,620 in monthly installments of $9,000 and to contribute $100,000 toward Susan's legal fees.
 {¶ 4} In his first assignment of error, Stuart argues that the trial court erred by overturning the magistrate's decision to strike the testimony of Susan's expert witness, Ann Crittenden, author of the book The Price of Motherhood. Stuart argues that his substantial rights were affected by the admission of Crittenden's testimony, and that an entire book could not be admitted as substantive evidence.
 {¶ 5} The admission or exclusion of evidence by the trial court will not be reversed unless there has been a clear and prejudicial abuse of discretion.[3] Under Evid.R. 103(A), error "may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."
 {¶ 6} At trial, Crittenden testified that she had received a master's degree in economics from the Columbia University School of International Affairs. Crittenden then worked as a reporter for Fortune magazine, as a financial writer and foreign correspondent for Newsweek magazine, and as a reporter for the New York Times. Crittenden had also worked as a freelance writer, a director of a global-economy institute, and an economics commentator for CBS News. She had authored three books, includingThe Price of Motherhood.
 {¶ 7} Following our review of the record, we cannot say that Stuart's rights were prejudicially affected by the admission of Crittenden's testimony. The testimony related to the price paid by at-home mothers in terms of lost income opportunities. But, with or without this evidence, the court was independently required by R.C. 3105.18(C)(1)(m) to consider "[t]he lost income production capacity of either party that resulted from that party's marital responsibilities" in determining whether spousal support would be appropriate. Because the substance of Crttenden's testimony was subsumed in the court's required consideration of factor (m), Stuart was not prejudiced by the court's consideration of the evidence.
 {¶ 8} Moreover, while the court indicated that it had considered Crittenden's testimony, the record demonstrates that the court did not rely on it in assessing the amount or duration of spousal support. For those figures, the trial court relied on the testimony of Dr. Louis Noyd, an economist.
 {¶ 9} Nor does the record demonstrate that Stuart was prejudiced by the admission of Crittenden's book. Evid.R. 706, adopted in 1998, effectively codified the common-law rule that "medical books or treatises, even though properly identified and authenticated and shown to be recognized as standard authorities on the subjects to which they relate, are not admissible in evidence to prove the truth of the statements contained therein."[4] The rule addressed the concern that "[e]ven where such a book or treatise merely recites facts observed by the writer and the opinions of the writer, admission in evidence of such a book or treatise or any part thereof would, in effect, admit into evidence the testimony of the author of the book without affording to opposing counsel any opportunity to cross-examine him. Furthermore, the court would, in effect, be allowing the author to testify without having required him to take the usual oath required of a witness."[5]
 {¶ 10} In this case, where the author of the book testified regarding her research and the contents of her book and was subject to cross-examination, we cannot say that the trial court abused its discretion in admitting the book into evidence. Even if the trial court did err by admitting the book in its entirety, the error clearly did not prejudice Stuart's substantial rights in view of the statutory requirement that the trial court consider Susan's lost-income-production capacity. Because the record demonstrates that Stuart was not prejudiced by the trial court's admission of Crittenden's testimony or her book, we overrule his first assignment of error.
 {¶ 11} In his second assignment of error, Stuart argues that the trial court erred by awarding $1,415,620 in "compensatory spousal support" to Susan. He reasons that the court simply reimbursed her for lost income, and that its award was therefore a windfall. Because a trial court is granted broad discretion in determining an award of spousal support, we will not reverse a spousal-support award absent an abuse of that discretion.[6]
 {¶ 12} After an equitable division of the marital assets and liabilities, and upon the request of either party, the court must consider whether an award of spousal support would be reasonable and appropriate.[7] In making this determination, the court is required to consider fourteen factors under R.C.3105.18(C)(1):
 {¶ 13} "(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
 {¶ 14} "(b) The relative earning abilities of the parties;
 {¶ 15} "(c) The ages and the physical, mental, and emotional conditions of the parties;
 {¶ 16} "(d) The retirement benefits of the parties;
 {¶ 17} "(e) The duration of the marriage;
 {¶ 18} "(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
 {¶ 19} "(g) The standard of living of the parties established during the marriage;
 {¶ 20} "(h) The relative extent of education of the parties;
 {¶ 21} "(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
 {¶ 22} "(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
 {¶ 23} "(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;
 {¶ 24} "(l) The tax consequences, for each party, of an award of spousal support;
 {¶ 25} "(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;
 {¶ 26} "(n) Any other factor that the court expressly finds to be relevant and equitable."
 {¶ 27} In this case, the record reveals that before Stuart and Susan were married, they had agreed that Susan would quit her job and that she would not work outside the home. Stuart had told Susan that he would support her financially because she was going to be raising a family. The parties also had agreed that Susan would not work outside the home until their minor child graduated from high school.
 {¶ 28} Based upon the evidence presented, the trial court found that the parties had enjoyed an "opulent" lifestyle, with income and expenditures of nearly $500,000 per year. The court considered the testimony of Dr. Noyd regarding the value of Susan's total projected earnings in its determination of her lost-income-production capacity. The court offset the amount of those projected earnings by the portion attributable to the duration of the parties' marriage because Susan had "had the value and enjoyment of an opulent lifestyle, including an expensive education for her oldest son, not a child of the marriage. After separation, [Stuart] continued to support [Susan] in a comfortable lifestyle. The fact that she has accumulated little to show for the lifestyle during the marriage is as much her responsibility as [Stuart's]." The court further offset the total projected earnings by the portion that Susan was projected to earn following the minor child's graduation from high school.
 {¶ 29} We note that the term "compensatory spousal support" is found nowhere in R.C. 3105.18(C), and that the trial court's use of the term was therefore ill-advised. But given that the record demonstrates that the court properly considered each of the statutory factors and not only Susan's lost-income-production capacity, we cannot say that it abused its discretion in assessing the spousal-support award.
 {¶ 30} Stuart also complains that the trial court declined to permit the termination of spousal support upon Susan's remarriage or cohabitation. Under R.C. 3105.18(E), a trial court must specifically reserve jurisdiction in its divorce decree in order to modify a spousal-support award. The trial court's decision to retain such jurisdiction is reviewed on an abuse-of-discretion basis.[8] Moreover, a trial court is not required to reserve jurisdiction to terminate spousal support in the event of cohabitation.[9]
 {¶ 31} In Kimble v. Kimble,[10] an ex-husband filed a motion to terminate spousal support following his ex-wife's remarriage. The trial court denied the motion, holding that the ex-husband was obligated to continue to pay the support. The court of appeals reversed and terminated spousal support. The ex-wife appealed to the Ohio Supreme Court.
 {¶ 32} In that appeal, the ex-husband cited Dunaway v.Dunaway[11] in support of his argument that public policy dictated that a person should not be required to continue to pay spousal support to an ex-spouse who has remarried. The Ohio Supreme Court noted that the Dunaway court, in holding that the ex-wife's remarriage had terminated her alimony award, based its decision strictly upon public-policy principles.[12] TheKimble court held that the policy set forth in Dunaway
conflicted with and had been superceded by amended R.C.3105.18.[13] The court reinstated the trial court's award of spousal support and held that, pursuant to R.C. 3105.18(E), a trial court may modify or terminate an order for spousal support only if the divorce decree contains an express reservation of jurisdiction.[14] Kimble makes clear that a party's remarriage does not automatically terminate an award of spousal support.
 {¶ 33} Furthermore, R.C. 3105.18(B) states, "Any award of spousal support made under this section shall terminate upon the death of either party, unless the order containing the award expressly provides otherwise." The statute makes no mention of the effect of remarriage or cohabitation. "The legislature only provided [that] death, not remarriage or cohabitation, shall terminate spousal support unless the award expressly provides otherwise."[15]
 {¶ 34} The Ninth Appellate District in McClusky v.Nelson[16] noted that "the 1991 amendment to R.C.3105.18(B) added the language, `Any award of spousal support made under this section shall terminate upon the death of either party, unless the order containing the award expressly provides otherwise,' * * *. [T]he fact that the legislature chose to provide a specific exception to the statute for the case of death of the obligor, but did not provide an exception for remarriage of the obligee, supports our finding that, under these circumstances, remarriage of the obligee does not automatically terminate the obligor's duty to pay the alimony, as provided in the parties' agreement."
 {¶ 35} In this case, we hold that the trial court did not abuse its discretion in failing to retain jurisdiction to terminate spousal support in the event of Susan's remarriage or cohabitation. Accordingly, we overrule Stuart's second assignment of error.
 {¶ 36} In his third assignment of error, Stuart argues that the court erred by awarding Susan $100,000 in attorney fees. He claims that the majority of Susan's legal fees involved the presentation of argument regarding her claimed lost income, including the presentation of the testimony of Crittenden regarding the price of motherhood. Stuart argues that there was no basis for the court to require him to contribute to Susan's fees when they were used to espouse a legally unfounded position.
 {¶ 37} We will not disturb an award of attorney fees absent an abuse of discretion by the trial court.[17] In an action for divorce, a court may award attorney fees under R.C.3105.18(H), if the court first determines (1) that the party ordered to pay has the ability to pay, and (2) that the other party would be prevented from fully litigating her rights and adequately protecting her interests if attorney fees are not awarded.[18]
 {¶ 38} In this case, Susan presented evidence to support the trial court's finding that she would have been prevented from fully litigating her rights and adequately protecting her interests in the litigation without reimbursement for legal services, and that Stuart had the ability to pay the fees. Susan also presented evidence that her attorney fees were over $140,000.
 {¶ 39} Therefore, even if a portion of the fee award could be attributed to the contested testimony of Crittenden, the actual award provided for a significant reduction in the amount of the fees requested. Consequently, we cannot say that the trial court acted arbitrarily in awarding Susan $100,000 in attorney fees. We overrule Stuart's third assignment of error.
 {¶ 40} In her sole assignment of error, Susan argues that the trial court erred by ordering spousal support based upon lost-income-production capacity without considering the time value of money. Essentially, Susan argues that the payment of interest would have addressed the problem caused by the loss of value on any unpaid sums of money.
 {¶ 41} In support of her argument, Susan cites R.C. 1343.03, which provides for a creditor's entitlement to interest when money becomes payable upon judgments for the payment of money "arising out of tortious conduct or a contract or other transaction." But we note that the Ohio Supreme Court has held that, in the context of divorce proceedings, R.C. 1343.03 is applicable only to support judgments reduced to a lumpsum amount when the obligor is in arrears.[19] In this case, the court had not reduced the judgment to a lump sum after finding an arrearage. Accordingly, we hold that the trial court did not err in failing to award interest. We overrule Susan's assignment of error, and we affirm the judgment of the trial court.
Judgment affirmed.
Hildebrandt and Sundermann, JJ., concur.
[2] We refer to the parties by their first names because they share the same surname.
[3] O'Brien v. Angley (1980), 63 Ohio St.2d 159,407 N.E.2d 490.
[4] See Hallworth v. Republic Steel Corp. (1950),153 Ohio St. 349, 354, 91 N.E.2d 690.
[5] Id.
[6] See Kunkle v. Kunkle (1990), 51 Ohio St.3d 64,554 N.E.2d 83; Martin v. Martin (1985), 18 Ohio St.3d 292,480 N.E.2d 1112.
[7] R.C. 3105.18(B).
[8] Johnson v. Johnson (1993), 88 Ohio App.3d 329,623 N.E.2d 1294.
[9] See Jordan v. Jordan (1996), 117 Ohio App.3d 47,689 N.E.2d 1005; O'Brien v. O'Brien, 5th Dist. No. 2003-CA-F12069,2004-Ohio-5881.
[10] 97 Ohio St.3d 424, 2002-Ohio-6667, 780 N.E.2d 273.
[11] (1990), 53 Ohio St.3d 227, 560 N.E.2d 171.
[12] 97 Ohio St.3d 424, 426, 2002-Ohio-6667, 780 N.E.2d 273, at ¶ 9.
[13] Id.
[14] Id. at ¶ 10.
[15] Newman v. Newman, 5th Dist. No. 2003 CA 00105,2004-Ohio-5363, at ¶ 55.
[16] (1994), 94 Ohio App.3d 746, 749, 641 N.E.2d 807, at fn. 1.
[17] Berger v. Berger, 1st Dist. No. C-030631,2004-Ohio-5614, citing Birath v. Birath (1988),53 Ohio App.3d 31, 39, 558 N.E.2d 63.
[18] See O'Brien, supra, at ¶ 76.
[19] See Dunbar v. Dunbar, 68 Ohio St.3d 369, 370,1994-Ohio-509, 627 N.E.2d 532; Dzina v. Dzina, 8th Dist. No. 83148, 2004-Ohio-4497, at ¶ 94.