OPINION
{¶ 1} Carl W. Meeks, defendant-appellant/cross-appellee, and Dolores H. Meeks, plaintiff-appellee/cross-appellant, appeal from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, in which the court granted the parties a divorce.
 {¶ 2} Dolores and Carl were married on September 25, 1984, and have one child, who was born May 7, 1987. The parties separated in March 2000, when Dolores and the parties' child moved into a separate residence. Although Carl subsequently began living with his girlfriend, he retained possession of the marital residence.
 {¶ 3} Dolores owns a hair salon. She leases the building she occupies and rents space to other stylists and manicurists. Carl is a 50 percent shareholder in a limited liability company, Team Investors, Ltd. ("Team Investors"), defendant-appellee, that invests in real estate. Team Investors owned property located at 5542 Columbus Pike, Lewis Center, Ohio. This property sold for $2 million before journalization of the final decree of divorce in the current case. Team Investors is also a 50 percent shareholder in a partnership, Held Team Partnership ("Held Team"), which also invests in real estate. Held Team owns property located at 5530 Columbus Pike, Lewis Center, Ohio. Although the parties anticipated this property being sold for $1.8 million prior to journalization of the final decree, no evidence was ever submitted that the property, in fact, ever sold. Carl also is a 50 percent shareholder in MB Liquidators, Inc. ("MB Liquidators"), defendant-appellee. Carl was injured in 2001 while working at his furniture store, which was owned by Oak Furniture Showroom, Inc., defendant-appellee, and receives disability payments from the United States Department of Veterans Affairs ("VA"), and testified at trial that he anticipates receiving social security disability payments. Carl also has interests in the companies Ads on Wings and Team Investors, Inc., defendants-appellees.
 {¶ 4} In June 2001, both parties filed complaints for divorce, and the matters were later consolidated. On August 11, 2003, Dolores filed a motion for contempt relating to Carl's failure to pay child and spousal support, pursuant to the temporary orders, and Carl was found in contempt of court on October 7, 2003.
 {¶ 5} A final hearing on the matter took place on various days from July 27, 2004 to August 26, 2004. On March 1, 2005, the court entered a judgment entry decree of divorce. Dolores and Carl both appeal the judgment of the trial court. Carl asserts the following four assignments of error:
I. THE TRIAL COURT ERRED BY AWARDING PLAINTIFF $414,991.00 AND ORDERING DEFENDANT TO PAY SAME AS ONE-HALF OF DEFENDANT'S PROCEEDS FROM POSSIBLE SALE OF PROPERTY OWNED BY AN LLC OF WHICH DEFENDANT OWNS A 50% INTEREST WHEN DEFENDANT RECEIVED NO "PROCEEDS" AND THE TRIAL COURT REFUSED TO CONSIDER THE TAX CONSEQUENCE OF THE PROPOSED TRANSACTION BY THE LLC.
II. THE TRIAL COURT ERRED BY AWARDING PERMANENT SPOUSAL SUPPORT TO PLAINTIFF WHEN DEFENDANT IS PERMANENTLY AND TOTALLY DISABLED AND THE SOLE DISABILITY INCOME IS SUBSTANTIALLY LESS THAN PLAINTIFF'S SELF-EMPLOYED INCOME AS AN OWNER AND OPERATOR OF A BEAUTY SALON.
III. THE TRIAL COURT ERRED BY INPUTING [sic] TO DEFENDANT $80,000.00 IN INCOME WHEN DEFENDANT HAS BEEN DETERMINED TO BE TOTALLY AND PERMANENTLY DISABLED AND THE CALCULATED CHILD SUPPORT BASED ON THAT INCOME.
IV. THE TRIAL COURT ERRED BY REFUSING TO FIND THAT THERE WAS A DE FACTO TERMINATION OF THE MARRIAGE AT THE TIME OF FILING THE ACTION IN JUNE 2001 AND UTILIZING THE TRIAL DATE OF JULY-AUGUST, 2004.
 {¶ 6} Dolores asserts the following four cross-assignments of error:
1. THE TRIAL COURT ERRED, ABUSED ITS DISCRETION AND RULED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHEN IT FOUND PLAINTIFF-CROSS-APPELLANT'S BEAUTY SALON BUSINESS TO HAVE A FAIR MARKET VALUE OF $100,000.00[.]
2. [THE] TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT GAVE DEFENDANT-APPELLANT CREDIT FOR PAY DOWN OF THE PRINCIPAL MORTGAGE AMOUNT ON THE PARTIES' MARITAL RESIDENCE[.]
3. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN NOT ORDERING DEFENDANT-APPELLANT TO PAY TO PLAINTIFF-CROSS-APPELLANT INTEREST ON THE JUDGMENT AMOUNTS AWARDED TO HER.
4. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN NOT ORDERING DEFENDANT-APPELLANT TO PAY TO PLAINTIFF-CROSS-APPELLANT REASONABLE ATTORNEY FEES AND EXPENSES INCURRED BY PLAINTIFF-CROSS-APPELLANT[.]
 {¶ 7} We will address Dolores' cross-assignments of error first. Dolores argues in her first cross-assignment of error that the trial court erred when it found her beauty salon business had a fair market value of $100,000. Dolores testified at trial that she could sell the salon for, at most, $10,000 for goodwill, but that the business has essentially no resale value. Although Carl has filed no brief responding to Dolores' cross-assignments of error, he asserted at trial that the business should have been valued at $100,000, which was the amount Dolores used on a loan application for her condominium. Dolores countered that the $100,000 value was the result of "puffing" in order to secure the loan. In the decree, the trial court valued the business at $100,000, based upon the $10,000 goodwill value combined with its 2003 gross receipts.
 {¶ 8} In making an equitable division of property, a trial court must first determine the value of marital assets.Hightower v. Hightower, Franklin App. No. 02AP-37, 2002-Ohio-5488, at ¶ 22. An appellate court will uphold a trial court's determination of valuation which is based upon competent, credible evidence absent a showing of an abuse of discretion.Moro v. Moro (1990), 68 Ohio App.3d 630, 637. R.C. 3105.171, which governs property distribution, expresses no specific way for the trial court to determine value. Focke v. Focke (1992),83 Ohio App.3d 552, 554. An appellate court's duty is not to require the adoption of any particular method of valuation, but to determine whether, based upon all the relevant facts and circumstances, the court abused its discretion in arriving at a value. James v. James (1995), 101 Ohio App.3d 668, 681. A trial court must have a rational evidentiary basis for assigning value to marital property. McCoy v. McCoy (1993), 91 Ohio App.3d 570,576-578.
 {¶ 9} With regard to the financial information for Dolores' salon, Dolores testified that, for tax year 2000, she had gross receipts of about $47,000. After cost of goods sold and deductions, she had a net profit of $4,179. In tax year 2001, she had gross receipts of about $55,000 and a net profit of about $6,000. In 2002, she had a net profit of about $12,500 and gross receipts of about $48,000. In 2003, she had gross receipts of $87,619, which included her rents from her other stylists, and $49,307 in net profits. Per week, she earns about $800 to $1,000 for her personal services. Further, at the time of trial, she had six other hair stylists and two nail technicians who rented space from her. The full-time hair stylists paid her $520 per month, the part-time hair stylists paid her $400 per month, and the nail technicians paid her $380 per month. In 2002, she received $32,000 in rents. In 2002, she paid $1,800 per month in rent for 1,600 square feet in a building, plus utilities. In 2003, she negotiated a lower rent of $900 per month. Since July 1, 2004, she has paid approximately $1,000 per month in rent.
 {¶ 10} At trial, there was very little testimony and evidence submitted as to the total valuation of Dolores' hair salon. Dolores testified that, on a loan application in 2001, she indicated her salon, including its equipment, was worth $100,000. She said this was the amount it would cost to start the business over again, and she only used such a high figure because she wanted the business to look valuable so she could obtain the loan to buy a condominium. Dolores then testified that she did not think she could sell her business. If she did try to sell it, she thought she could get $10,000 in goodwill. She said the value of the salon was comprised of her own skills, used furniture, and chairs that she rented to other stylists. She rented the building in which the salon was located and had no long-term contracts with the stylists or the landlord. Dolores also testified that she had tried to sell the salon periodically over the past 20 years but has never had a buyer. She said in 1998, she placed the business for sale at a price of $20,000, and the result was laughter because everyone felt the price was unreasonably high. Apart from pointing to the $100,000 valuation Dolores used on her loan application, Carl offered little guidance as to how to value Dolores' hair salon.
 {¶ 11} Given the lack of guidance by the parties, we cannot say the trial court abused its discretion in valuing Dolores' business at $100,000. The trial court thoroughly summarized the financial evidence presented with regard to the business and gave a rationale for how it ultimately arrived at the $100,000 figure. The trial court explained its valuation method was "[b]ased on its `good will' value of Ten Thousand Dollars ($10,000.00) combined with its 2003 gross receipts," and then concluded "Defendant's estimated value of One Hundred Thousand Dollars ($100,000.00) [is] a more accurate valuation of Dolores Hair Design than Plaintiff's estimated value of a mere Ten Thousand Dollars ($10,000.00)." Valuing businesses is a difficult task, and even experts in the field differ on the most appropriate methods to use when valuing certain types of businesses. The trial court here was presented with paltry evidence pertaining to the appropriate method for valuing this type of business. Neither party can now complain that the trial court used a method that took into consideration goodwill and the annual gross income of the business when it was presented with nothing else with which to make a determination. Although experts may have enlightened the court with other, or even better, methods of valuing the salon, the trial court did not have the luxury of hearing such evidence. The trial court believed that taking into account only the goodwill value of the hair salon was not an accurate measurement of its true value. Given the parties' failure to submit any expert testimony as to any other means of valuation in the present case, we cannot say the trial court's valuation method constituted an abuse of discretion. Therefore, Dolores' first cross-assignment of error is overruled.
 {¶ 12} Dolores argues in her second cross-assignment of error that the trial court erred when it gave Carl credit for pay down of the principal mortgage on the parties' marital residence. Dolores maintains that she repeatedly asked Carl to sell the home but he refused. Dolores asserts that there is no rational basis for giving Carl credit for the amount of the principal paid down on this marital asset during the pendency of the divorce, considering that it was a payment that would not have been necessary had the property been sold. She claims that to credit Carl with an amount equal to the principal reduction on a joint marital debt, when the debt could have been eliminated, had the effect of reducing the marital equity, which should have been equally divided between the parties. Dolores points out that Carl was also presumably deducting the mortgage interest and real estate taxes on his income tax returns, and that she remained a co-obligor on the mortgage during the period in question. Dolores views Carl's payments as merely preserving a marital asset.
 {¶ 13} In the decree, the trial court found that the marital home had a fair market value of approximately $265,000, and, at the time of the separation in March 2000, the mortgage balance was $115,904.90. At the time of trial, the mortgage balance was approximately $65,000. The trial court noted that, although Dolores claims she asked Carl to sell the home during the pendency of the action, she never filed a motion with the court requesting the same. The trial court then concluded the marital equity in the home should be reduced by Carl's individual contributions of $50,904, and, thus, found the marital equity in the home totaled $149,096.
 {¶ 14} The characterization of property as separate or marital is a mixed question of law and fact, and such characterization must be supported by sufficient, credible evidence. Kelly v. Kelly (1996), 111 Ohio App.3d 641. In the present case, there is not sufficient evidence to support the characterization of Carl's $50,904 in mortgage payments as his individual equity and not marital property. The trial court refused to find a de facto date of termination of the marriage for purposes of dividing the marital property, which we have found below was not error under our discussion of Carl's fourth assignment of error. Because the trial court found that the marriage terminated on the date of the final divorce hearing, the monies Carl spent on the mortgage payments prior to the date of the final hearing were marital funds. Carl presented no evidence he expended his own separate funds to make the mortgage payments.
 {¶ 15} By crediting Carl with the mortgage payments he made after the parties separated, the court, in effect, found a de facto date of termination for valuing the marital residence but for no other assets, which is generally impermissible. SeeHyslop v. Hyslop, Wood App. No. WD 01-059, 2002-Ohio-4656, at ¶ 34 (generally, a domestic relations court should use the same set of dates in valuing marital property). While a court may choose a different valuation date for certain assets, the court must adequately explain its reasons for doing so. Id., at ¶ 36. Here, the trial court did not give any reasons to explain why the marital equity should be reduced by Carl's contributions. Further, the trial court failed to acknowledge that Carl had exclusive use of the marital residence during the period of separation, while Dolores had to incur expenses in obtaining and maintaining a separate residence for herself and the parties' child. Although Dolores was awarded the marital equity in her condominium she purchased in April 2001, she still was forced to pay the expenses of living in an apartment from March 2000 to April 2001, for which she received no clear credit. See Stacy v.Stacy, Ashtabula App. No. 2004-A-0076, 2005-Ohio-5289, at ¶ 36 (trial court did not err in failing to award husband reimbursement for the portion of mortgage payments attributable to principal and interest, as husband had exclusive use of the premises during the pending divorce litigation, and the wife had to maintain a separate residence); Partridge v. Matthews (Feb. 20, 2001), Brown App. No. CA2000-04-007 (trial court did not err in failing to credit wife with mortgage payments she made on the marital residence after the parties' separation, as the wife had the benefit of living in the house, while the husband did not). Accordingly, without adequate reasoning to support the trial court's determination, we find the trial court erred in failing to deem the $50,904 Carl made in mortgage payments during the parties' separation as a marital asset subject to division. See, also, Meyer v. Meyer (Oct. 26, 1994), Summit App. No. 16433 (husband not entitled to the increase in the equity of the marital home that was due solely to mortgage payments he made between the separation and the date of the final hearing). Therefore, Dolores' second cross-assignment of error is sustained.
 {¶ 16} Dolores argues in her third cross-assignment of error that the trial court erred when it failed to order Carl to pay her interest on the judgment amounts she was awarded. Dolores asserts that Carl's past actions regarding his failure to pay support arrears, his refusal to sell the marital home, and his failure to pay her attorney fees as ordered in the contempt action demonstrated he would not make any of the payments ordered by the final decree. Dolores points out that several of the ordered payments were supposed to be made within 30 days of the decree, and Carl failed to make any payments, thereby lessening the value of the eventual payouts at a later date.
 {¶ 17} This court discussed interest awards on property divisions and other orders pursuant to a decree of divorce inFarley v. Farley (Aug. 31, 2000), Franklin App. No. 99AP-1103. In Farley, the wife argued that the trial court erred in not awarding interest on several awards made in her favor in a divorce decree. Specifically, she requested that the husband pay interest on an award for a $45,160 offset for the husband's withdrawals from money market accounts, the net cash surrender value of life insurance, and a $30,000 award for attorney fees. She also requested that interest be imputed due to delays by the husband in facilitating and effectuating the sale of the parties' rental properties.
 {¶ 18} We first noted in Farley that case law on the issue of interest on property divisions pursuant to a decree of divorce is somewhat unsettled. We found that, pursuant to Woloch v.Foster (1994), 98 Ohio App.3d 806, 812, an order distributing marital assets from one party to another has the force of a money judgment, and the recipient is entitled to interest on any amount due and owing under the order but unpaid, pursuant to R.C.1343.03. However, we also found that, pursuant to Koegel v.Koegel (1982), 69 Ohio St.2d 355, a trial judge is not obligated to mandatorily affix interest to monetary obligations that arise out of a property division upon divorce, but interest may be awarded at the discretion of the trial court where the proceeds are payable at a future date, upon realization through future sale, and are incalculable at present with any certainty.
 {¶ 19} Applying the concepts in Woloch and Koegel, we found in Farley the proceeds from the sale of rental properties were most akin to the property division in Koegel, since they not only were payable at a future date, upon realization through sale, but were incalculable at present with any certainty. Thus, we concluded interest on division of the real property, even where limited to any delay caused by the husband, would be awardable only at the trial court's discretion under Koegel,
rather than mandated by R.C. 1343.03. Therefore, we found no abuse of discretion on the part of the trial court in declining to order interest be paid by the husband on this award.
 {¶ 20} With respect to post-judgment interest accruing on quantified amounts due and payable as set forth in the Farley
divorce decree, i.e., the $30,000 in attorney fees, $45,160 money market account offset, and cash surrender values of life insurance policies, we found these sums fell within the ambit ofWoloch, which requires strict application of R.C. 1343.03 and mandates interest on amounts calculable, due, and payable under a decree of divorce. We noted that following such a rule would provide another incentive, above and beyond the traditional use of the domestic relations court's contempt powers as an incentive, for the prompt and full payment of liquidated sums due under a divorce decree. Therefore, we concluded that the trial court should have imposed post-judgment interest upon these awards.
 {¶ 21} In the present case, Dolores specifically seeks interest on the following awards in the divorce decree: (1) $287,491.79 as her half of the marital equity of Team Investors investment in the real estate located at 5542 Columbus Pike, to be paid within 30 days of the journalization of the decree; (2) $127,500 as her half of the marital equity of Team Investors investment in the real estate located at 5530 Columbus Pike, to be paid within 90 days of the journalization of the decree; (3) $44,735.50 as her share of the marital equity in the marital home, to be paid within six months of the journalization of the decree; (4) $33,829 in spousal support arrearage as of January 24, 2004, to be paid within 30 days of the journalization of the decree; and (5) $800 for her attorney fees, to be paid within 30 days of the journalization of the decree.
 {¶ 22} Applying our analysis in Farley to the present case, we find all of the above awards fall within the ambit ofWoloch, which requires interest be awarded on amounts due and payable under a decree of divorce pursuant to R.C. 1343.03. Clearly, the trial court set forth calculable amounts for Dolores' share in the marital home, the spousal support arrearage, and attorney fees, and ordered them payable by specific dates. Thus, they were calculable, due, and payable, as required by Woloch and R.C. 1343.03.
 {¶ 23} As for the two investment properties, the amounts due Dolores as her marital portion of these properties were also calculable, due, and payable. At the time of the decree, the parties submitted evidence regarding the finalization of the sale of the 5542 Columbus Pike property for $2 million, with the profit to the sellers being $1,149,967.16. The trial court found Carl's interest was $574,983.58, determined it was marital, calculated Dolores' share as $287,491.79, and then ordered such to be paid within 30 days of the journalization of the decree. Thus, this award to Dolores was calculable, due, and payable. With regard to the 5530 Columbus Pike property, although there was no evidence as to whether the property had sold as of the date of the decree, or for what price it may have sold, the trial court's award to Dolores from the marital portion of this investment was not contingent upon the final sale price of the property or a future sale date. Rather, the trial court viewed the $1.8 million contract price for the property as a fair appraisal of the property, and specifically calculated Dolores' share of the marital portion of the property at $127,500, and ordered it paid within 90 days of the decree. Thus, this award was also calculable, due, and payable. In this respect, the awards in the present case are unlike those for the rental properties in Farley, in that the awards in Farley were for an equal division of an unknown sale amount to take place on an unknown sale date. Here, the decree established an appraisal amount for the property, a set award for Dolores' portion of that property, and a set date for the payment. Based upon the reasoning in Farley, because all the above sums were calculable, due, and payable, we find the trial court erred in failing to order interest be paid on the awards for payments made beyond the periods set forth in the decree. We note that the domestic court should be wary of Farley when assigning due dates in decrees because interest may begin to accrue on those dates. In addition, because of our disposition of Dolores' second cross-assignment of error above and Carl's first assignment of error below, the specific amounts due Dolores will be different than those set forth in the decree and discussed above. Therefore, the trial court should reset the dates on which the payments are due, whether those dates remain the same or change due to the results of the appeal. Accordingly, Dolores' third cross-assignment of error is sustained.
 {¶ 24} Dolores argues in her fourth cross-assignment of error that the trial court erred when it failed to order Carl to pay her reasonable attorney fees and expenses. Prior to April 2005, attorney fees were awarded in domestic relations cases pursuant to R.C. 3105.18(H). In determining whether to award reasonable attorney fees to either party, the trial court was required to decide whether either party would be prevented from fully litigating that party's rights and adequately protecting that party's interests if it did not award reasonable attorney fees. R.C. 3105.18(H). Fees could be awarded only if the payor spouse had the ability to pay. Id. See, also, Lee v. Lee (1983),10 Ohio App.3d 113. A court's decision regarding the award of attorney fees as part of an award of spousal support will not be disturbed on appeal absent a showing of a clear abuse of that discretion. See Guziak v. Guziak (1992), 80 Ohio App.3d 805,816. An abuse of discretion is more than a mere error of law; rather, it implies that the court's decision was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 25} As of August 2004, Dolores had incurred $37,594.35 in attorney fees. Dolores testified that she had paid $9,000 of those fees with a credit card and has incurred $78,000 in individual credit card debt over the course of the proceedings. She also used some of the proceeds from the sale of her Rolex watch to pay her fees. Dolores asserts that, although the trial court found she could pay her attorney fees with the awarded marital assets, Carl is in arrears for support payments and owes a substantial amount of money to her, including attorney fees as a result of a previous contempt proceeding. Dolores argues that Carl received $830,000 from the sale of the investment real estate and has considerable equity in the marital home he was afforded. She claims she was awarded no liquid assets and has a staggering credit card debt. Dolores maintains that she was not able to fully litigate her rights and adequately protect her interests without incurring debt.
 {¶ 26} The court found that, although Carl's disability income and his business and non-marital assets were of a high enough value to give him the ability to pay at least part of Dolores' attorney fees, Carl was represented by counsel and incurred his own fees. The court was also not convinced that Dolores would be prevented from fully litigating her rights and adequately protecting her interests without ordering Carl to pay her attorney fees. The court concluded that Dolores' income and her awarded marital assets would enable her to pay her attorney fees. We find the trial court did not abuse its discretion in failing to award attorney fees to Dolores. Although Carl has yet to pay the amounts ordered, he must timely comply with the court's order, or pay interest on these amounts. Although the awarded amounts may be affected by this court's determinations on appeal, they are significant and place Dolores in the position to be able to pay for her counsel's services. See Gerlach v.Gerlach, Franklin App. No. 03AP-22, 2004-Ohio-1607 (given property distribution, wife had ability to fully litigate her rights and protect her interests). Further, although Dolores is concerned about her high credit card debts, the trial court found that the parties' minor child has access to her credit cards, and that Dolores has enabled their daughter to spend imprudently and live beyond the parties' means. The court found Dolores' plying her teenage daughter with expensive trinkets and treats to be unnecessary and an overindulgence. For these reasons, we agree with the trial court that Dolores failed to demonstrate she would be unable to adequately represent her legal interests without an award of attorney fees. Therefore, Dolores' fourth cross-assignment of error is overruled.
 {¶ 27} Carl argues in his first assignment of error that the trial court erred when it awarded Dolores $414,991.79 and ordered him to pay such amount as one-half of his proceeds from the sale of property owned by Team Investors, when he received no proceeds, and the trial court refused to consider the tax consequences of the proposed transactions by Team Investors. Accordingly, Carl's argument is two-fold: (1) the trial court erred in ordering him to pay Dolores $414,991.79 for her share of the marital portion of 5542 Columbus Pike and 5530 Columbus Pike, when no proceeds were ever taken from the sale of 5542 Columbus Pike and 5530 Columbus Pike never sold; and (2) the trial court erred in failing to take into consideration the tax consequences relating to the investments in 5542 Columbus Pike and 5530 Columbus Pike when awarding Dolores her share of the marital portion of the investments.
 {¶ 28} With regard to the first argument, the trial court ordered Carl to pay Dolores $287,491.79 for her share of the marital portion of the 5542 Columbus Pike property, which the court valued at $2 million, and $127,500 for her share of the marital portion of the 5530 Columbus Pike property, which the court valued at $1.8 million. Carl complains that there were no proceeds for the 5542 Columbus Pike property sale because he and his business partner, Allan Blue, utilized a tax-free exchange to use the proceeds to invest in other real estate, thereby resulting in no direct distribution of funds to Team Investors. In addition, because the 5530 Columbus Pike property did not sell, he has never received any proceeds related to this property. Thus, Carl argues, because he received no proceeds from these properties, he has no money available to pay the trial court's award to Dolores.
 {¶ 29} The trial court is vested with broad discretion in dividing the marital assets pursuant to R.C. 3105.171.Middendorf v. Middendorf (1998), 82 Ohio St.3d 397. Thus, the trial court's determination will not be disturbed on appeal absent an abuse of discretion by the trial court. Id. In the present case, we cannot say the trial court erred in ordering Carl to pay $414,991.79 as Dolores' share of the marital portion of the two Columbus Pike properties. Carl's appellate brief and written closing argument filed in the trial court are devoid of any alternative suggestion as to what arrangement he may have desired to assure Dolores received her share of the marital portion of the properties. It is the duty of this court to determine whether the trial court acted unreasonably, arbitrarily, or unconscionably. Presumably, Carl desires that the investment properties remain intact. However, there is no explanation as to how the investment properties may remain intact while still awarding Dolores half of the marital portion of the investments. Although the parties could have agreed upon a plan to somehow pay Dolores her due marital portion of the investments, they chose not to do so, thereby making it necessary for the trial court to resolve the matter.
 {¶ 30} In simplest terms, the investment properties contained a portion of marital property, and the trial court divided that portion equally between the parties. How Carl chooses to extract Dolores' share of the marital portion from the investments or chooses to obtain a sum equal to the value of such share is left to his discretion. Carl's argument that he has no resources to pay the court's judgment is wholly unconvincing. In fact, Carl does have the resources necessary to pay Dolores her share of the marital portion of the property; however, the "resources" lay in the unliquidated value of the real estate, which the trial court did not order to be sold. We find the trial court did not err in granting Dolores one-half of the marital portion of the Columbus Pike properties based upon the fair market value of the properties at the time of the hearing.
 {¶ 31} Notwithstanding this determination, we must also address whether the trial court erred in failing to take into account the tax consequences of a sale of the investment property when determining the amount of Dolores' portion. Blue testified that a sale would result in capital gains of approximately $494,000 and income recapture of approximately $81,000 for Carl on the 5542 Columbus Pike property and capital gains of approximately $225,000 and income recapture of approximately $33,000 for Carl on the 5530 Columbus Pike property. Blue also testified there would be various fees and costs associated with the sale of the properties. The trial court found Blue's testimony as to these tax consequences was irrelevant. The court stated its statutory obligation was to value and divide the business assets and not to discount the value by considering various tax consequences. It concluded that any tax consequences would ultimately result from business decisions over which it had no authority to consider when dividing the value between the parties. We disagree.
 {¶ 32} In making a division of marital property, a trial court must consider all factors enumerated in R.C. 3105.171(F).Casper v. DeFrancisco (Feb. 19, 2002), Franklin App. No. 01AP-604. R.C. 3105.171(F)(6) requires the court to consider the tax consequences of the property division upon the respective awards to be made to each spouse, and (F)(7) requires the court to consider the costs of any sale if it is necessary that an asset be sold to effectuate an equitable distribution of property. In the present case, it is apparent the trial court desired to divide the value of the marital portion in the two properties evenly to achieve an equitable distribution. However, failing to take into account the impact the tax consequences would have on the proceeds when the properties are sold would render the trial court's division inequitable. See Terry v.Terry (1994), 99 Ohio App.3d 228, 233 (a trial court must consider the costs associated with a sale of assets in order to insure an equitable distribution of property); Day v. Day
(1988), 40 Ohio App.3d 155, 159 (where an asset is to be liquidated the tax consequences must be considered); Herrmann v.Herrmann (Nov. 6, 2000), Butler App. No. CA99-01-006 (when a trial court's order forces a party to dispose of an asset to meet an obligation imposed by the court, the court must consider the tax consequences). In Day, this court discussed the implications of R.C. 3105.171(F), stating:
Tax consequences of property division * * * are proper considerations for the court, so long as those consequences are not speculative. For example, if the award is such that, in effect, it forces a party to dispose of an asset to meet obligations imposed by the court, the tax consequences of that transaction should be considered.
Id., at 159.
 {¶ 33} In the present case, although the trial court does not explicitly order Carl to sell property in order to satisfy the court ordered payments to Dolores, it is apparent from the trial court's marital balance sheet attached to its decree that Carl's other assets are insufficient to satisfy the court ordered obligations. See Gest v. Gest (Apr. 29, 1998), Lorain App. No. 96CA006580 (while the court did not order the husband to sell any property, a sale appears to be the practical effect of the court's order, as the property awarded to the husband included insufficient cash). This is not a situation as in Waller v.Waller, 163 Ohio App.3d 303, 2005-Ohio-4891, at ¶ 30, and similar cases, where the trial court specifically determined that it would not be necessary to liquidate assets to satisfy the court's property division, and, thus, there would be no immediate, certain tax consequences. See, also, Guidubaldi v.Guidubaldi (1990), 64 Ohio App.3d 361, 367-368 (finding the proposed tax consequences were speculative because nothing in the record suggested there must be a premature withdrawal of retirement monies to satisfy the court's order); Gould v.Gould, Butler App. No. CA2004-01-010, 2005-Ohio-416, at ¶ 49 (wife was not required to withdraw funds from her IRA to meet any obligation imposed by the court, and there is no evidence in the record that she needed to do so to meet any current financial obligation; thus, any tax consequences are speculative);Robinson v. Robinson (May 8, 1998), Montgomery App. No. 16613 (the trial court did not require specific assets to be liquidated, and the husband was awarded other assets that could have been sold to pay the court ordered obligation that would not have resulted in tax consequences); White v. White (Feb. 18, 1998), Summit App. No. 18275 (where nothing in the record suggests that an asset must be liquidated, tax consequences are speculative and need not be considered). Here, the record suggests, and Carl admits that the only assets available to satisfy the court's order are the Team Investors real estate holdings. Thus, we remand the matter for a determination of the current tax consequences and other costs that would result from selling the marital portion of the properties to be deducted from the proceeds that would be equally divided. See James, supra (in order to properly value and divide a marital asset, the matter was remanded for the trial court to consider the tax consequences of selling the marital property). The trial court may make this determination upon remand pursuant to another hearing, newly submitted evidence, or evidence already in the record. Of course, the parties may also develop an equitable alternative plan if both agree that it would be in each of their best interests to do so. Therefore, Carl's first assignment of error is sustained in part and overruled in part.
 {¶ 34} We will address Carl's second and third assignments of error together, as they share common issues and Carl relies upon some of the same arguments for both assignments of error. Carl argues in his second assignment of error that the trial court erred when it awarded permanent spousal support to Dolores because he is permanently and totally disabled, and his disability income was substantially less than her self-employed income as an owner of a beauty salon. Carl argues in his third assignment of error that the trial court erred when it used $80,066 as his income for purposes of the child support calculation when he has been determined to be totally and permanently disabled.
 {¶ 35} We will address the child support issues in Carl's third assignment of error first. In calculating child support, a trial court must determine the parents' income. R.C. 3119.023. Pursuant to R.C. 3119.01(C), income for child support purposes is defined to include the sum of the parent's gross income and "any potential income of the parent." R.C. 3119.01(C)(5)(b). Potential income includes imputed income that the court determines the parent would have earned if fully employed based upon the criteria articulated in R.C. 3119.01(C)(11)(a)(i) through (x). However, before a trial court may impute income to a parent, it must first find that the parent is voluntarily unemployed or underemployed. Inscoe v. Inscoe (1997), 121 Ohio App.3d 396,424; Marek v. Marek, 158 Ohio App.3d 750, 2004-Ohio-5556, at ¶14. Whether a parent is voluntarily unemployed or underemployed is a determination within the trial court's discretion and will be upheld absent an abuse of discretion. Rock v. Cabral (1993),67 Ohio St.3d 108, 112.
 {¶ 36} In the present case, the trial court found Carl was voluntarily unemployed. We agree. Carl earned a bachelor's degree in 1971, and worked in the furniture business until opening his own furniture store in the early 1980s. He also has been involved in various business endeavors with Blue for the past 13 years. The court acknowledged that Carl stopped operating the furniture store in March 2001, because his back was severely injured while working at the store. The court also did not dispute that Carl was disabled because of this injury and that he has arthritis in his back, hips, knees, and a congenital heart defect. However, the trial court found the evidence established that Carl continued to carry out the everyday tasks of his current business endeavors with Blue. The court cited Blue's testimony that Carl routinely appeared onsite for liquidations pursuant to their liquidation business, MB Liquidators. Carl also admitted he was at a local mall three times per week while they were liquidating it. In furtherance of this business, he conducted research as to the value of items to be liquidated. Carl testified that he assisted in liquidating the local Enron office, although he said it was only a two-day project. Given this evidence, we cannot say the trial court erred in finding that Carl was voluntarily unemployed. It was apparent from the record that Carl had the skills, experience, and ability to engage in gainful employment of some sort, although not in any involving heavy physical labor. In fact, it appears from the record that Carl was engaging in work activities, despite his claims of total disability. For these reasons, we cannot find the trial court abused its discretion in finding that Carl was voluntarily unemployed.
 {¶ 37} Once a party is found to be voluntarily unemployed, the court may then impute income to the party. The amount of income imputed to a person found to be voluntarily unemployed is a question of fact, not to be disturbed absent an abuse of discretion. Rock, at 112. Pursuant to R.C. 3119.01(C)(11)(a), when imputing income to a parent, the trial court must consider: (i) the parent's prior employment experience; (ii) the parent's education; (iii) the parent's physical and mental disabilities, if any; (iv) the availability of employment in the geographic area in which the parent resides; (v) the prevailing wage and salary levels in the geographic area in which the parent resides; (vi) the parent's special skills and training; (vii) whether there is evidence that the parent has the ability to earn the imputed income; (viii) the age and special needs of the child for whom child support is being calculated under this section; (ix) the parent's increased earning capacity because of experience; and (x) any other relevant factor.
 {¶ 38} Here, the trial court thoroughly reviewed the factors and used income of $80,066 per year to calculate Carl's child support, $30,866 of which was seemingly imputed and the rest of which was apparently based upon calculations for VA benefits and social security benefits. Carl specifically refutes several of the trial court's findings in this respect and ostensibly seeks a finding that his only income is the $2,400 per month he receives from the VA as a result of his becoming totally disabled in March 2001. Carl first argues that the trial court improperly relied upon tax returns that were filed in the late 1990s before his March 2001 injury. However, in imputing income for purposes of child support, the trial court did not rely upon tax returns that were filed in the late 1990s. The only tax return the trial court noted in its imputation analysis that was prior to his injury was his 2000 tax return, which showed he earned approximately $81,000, $67,000 of which was from his furniture store. Carl was injured in early 2001, severely hampering his ability to operate the furniture store, and the trial court noted the significant drop in income from the furniture store for years 2001 and 2002. Although the trial court did summarize Carl's income from 1996, 1998, and 1999, in determining whether to award spousal support, the trial court specifically acknowledged that these amounts were earned prior to his becoming permanently disabled, and the court did not rely upon them in imputing income to Carl. Thus, Carl's argument, in this respect, is without merit.
 {¶ 39} Carl next contends the court wrongly found his business endeavor with Blue generated income, pointing out that Blue testified the companies did not even have sufficient cash flow to pay real estate taxes. However, despite Carl's contention in this respect, he fails to address the trial court's myriad findings on the income produced by Team Investors and MB Liquidators, both of which he was a 50 percent shareholder. The trial court found the evidence established: (1) that Team Investors distributed $24,000 to Carl in 2001; (2) that Team Investors distributed $14,750 to Carl in 2002; (3) that Carl received $8,100 in distributions from Team Investors in 2003; (4) that MB Liquidators earned more than $50,000 from the local mall liquidation; and (5) Team Investors received $1,000 per month in rent for a cell tower on the 5542 Columbus Pike property. Carl fails to refute any of this evidence or explain why these various payments and disbursements should not be considered in imputing income to him for purposes of child support.
 {¶ 40} Additionally, Carl fails to rebut the numerous examples of other income attributed to him. The trial court cited several examples of income for which Carl could not account. Carl's National City Bank checking account statements showed deposits of over $49,000 in 2001. Carl did not remember where these monies came from, although he did say some may have been lump sum payments from the VA. Although nearly all of the approximately $35,000 in deposits in 2002 could be traced to the VA, the trial court found only approximately $1,500 of the $49,000 in 2001 deposits could be traced to the VA. Further, for purposes of child support, the trial court imputed to him $5,900 of income paid to his girlfriend in 2003 by MB Liquidators, as the trial court believed the testimony was not credible that these payments were for services rendered by the girlfriend. In addition, the court considered Dolores' testimony that Carl earns more income than he was admitting on the record. Based upon this evidence of additional income in the past several years resulting from his business ventures, the trial court imputed potential income of $30,866 to Carl under R.C. 3119.01(C)(5)(b). Given the testimony and evidence, we cannot find the trial court erred in imputing this amount to Carl.
 {¶ 41} However, Carl also argues that the trial court erred in including $1,700 per month in his income based upon social security disability benefits he had applied for but had not yet been granted as of the time of the hearing. We agree. Social security disability benefits are specifically included as gross income for purposes of calculating child support pursuant to R.C.3119.01(C)(7); however, "gross income" under this section is considered all "earned and unearned income from all sources during a calendar year[.]" As Carl had not yet begun to receive social security disability payments, they had not been earned in any calendar year in order to be included as gross income. Thus, because there was no evidence that Carl had been granted social security benefits as of the time of the hearing, we find they were speculative and not properly included in Carl's income for purposes of calculating child support. When and if Carl begins receiving social security disability benefits, such additional income could be grounds for a modification of child support. Therefore, we find the trial court erred in including $20,400 in income to Carl as a result of the social security disability benefits that he had yet to be granted. See Morgan v. Morgan
(Oct. 24, 2001), Wayne App. No. 01CA0017 (anticipated income that had not yet been earned was too speculative to be considered potential income for purposes of calculating child support). Further, as Carl notes, if he is approved for social security disability benefits, his daughter would also receive benefits, which would affect the child support determination. See Williamsv. Williams (2000), 88 Ohio St.3d 441, syllabus (a disabled parent is entitled to a full credit in his or her child support obligation for social security payments received by a minor child due to the parent's disability). Therefore, Carl's third assignment of error is sustained in part and overruled in part, insofar as the trial court erred in including the speculative social security disability payments as part of Carl's income for purposes of calculating child support. Thus, the matter must be remanded for a recalculation of child support.
 {¶ 42} In his second assignment of error, Carl contests the trial court's award of spousal support. The court awarded spousal support to Dolores in the amount of $600 per month, plus processing charge, effective until further order of the court, and specifically retained jurisdiction to modify the amount or terms of spousal support. A trial court has broad discretion to determine the proper amount of spousal support based on the particular facts and circumstances of each case. Kunkle v.Kunkle (1990), 51 Ohio St.3d 64, 67. Pursuant to R.C.3105.18(C)(1), in determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, terms of payment, and duration of spousal support, the trial court must consider the following: (a) the income of the parties; (b) the relative earning abilities of the parties; (c) the ages and the physical, mental, and emotional conditions of the parties; (d) the retirement benefits of the parties; (e) the duration of the marriage; (f) the extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home; (g) the standard of living of the parties established during the marriage; (h) the relative extent of education of the parties; (i) the relative assets and liabilities of the parties, including any court ordered payments by the parties; (j) the contribution of each party to the education, training, or earning ability of the other party; (k) the time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought; (l) the tax consequences, for each party, of an award of spousal support; (m) the lost income production capacity of either party that resulted from that party's marital responsibilities; and (n) any other factor that the court expressly finds to be relevant and equitable. The trial court is not required to comment on each statutory factor; rather, the record need only show the court considered them in making its award. McClung v. McClung, Franklin App. No. 03AP-156,2004-Ohio-240, at ¶ 21.
 {¶ 43} Carl fails to object to the trial court's analysis of the spousal support factors as a whole, and, instead, focuses on a few specific arguments. Carl first argues the trial court abused its discretion when it imputed an annual income of $80,066 for spousal support purposes because there was no evidence to support such an imputation. For purposes of child support, we have already found the trial court erred in finding Carl's income to be $80,066. The trial court also used this same income figure to determine spousal support. Therefore, for the same reasons indicated above with regard to child support, we find the trial court erred in using this amount as Carl's income under its analysis of R.C. 3105.18(C)(1)(a).
 {¶ 44} Carl next asserts that spousal support was inappropriate because he is permanently and totally disabled and receives only $2,400 per month from the VA, while Dolores is self-employed and earns $49,000 per year. Carl maintains that Dolores' income of $49,000 per year was sufficient to meet her living needs. We first note that Carl points out Dolores' budget of $3,950 per month was unreasonably high but fails to further elaborate. Notwithstanding, the trial court specifically recognized that Dolores' monthly budget was unreasonably high due to exorbitant expenses traced to the parties' teenage daughter. Thus, the trial court considered this fact in making its determination under R.C. 3105.18(C)(1)(n), and Carl points to no further error on this issue.
 {¶ 45} Carl's main argument, that Dolores' income is sufficient to meet her living needs, is conclusory and lacking in any supportive analysis. After a review of the trial court's examination of the factors in R.C. 3105.18(C)(1), we fail to see any further error, and Carl fails to point out any specific flaw in the court's reasoning. Thus, we can find no abuse of discretion in this respect.
 {¶ 46} However, in analyzing the assets and liabilities of the parties under R.C. 3105.18(C)(1)(i), the trial court relied upon Dolores' receiving "significant cash proceeds" from the sale of the marital business assets. As we have found the court must take into account the tax consequences of selling these marital business assets, Dolores' proceeds will be affected. Further, as indicated above, the trial court erred in calculating Carl's income, thus, its analysis of R.C. 3105.18(C)(1)(a) will be impacted. Also, as we have found all of the equity in the marital residence should have been considered marital property, the parties' respective assets under R.C. 3105.18(C)(1)(i) will be affected. Therefore, because our determinations upon appeal regarding these issues may affect the trial court's analysis of spousal support, we must also remand the issue of spousal support to the trial court for reconsideration.
 {¶ 47} Carl also argues that the trial court erred in failing to indicate that the spousal support shall terminate upon the death of either party. However, R.C. 3105.18(B) provides that any award of spousal support made under this section shall terminate upon the death of either party, unless the order containing the award expressly provides otherwise. Here, the decree does not expressly provide otherwise; thus, the award automatically terminates upon the death of either party pursuant to R.C.3105.18(B). Therefore, we find no error in this respect.
 {¶ 48} Carl next argues that the trial court did not order spousal support to terminate upon the remarriage of Dolores as mandated by Hunt v. Hunt (1959), 169 Ohio St. 276. However,Hunt was overruled by the Ohio Supreme Court in In re Adams
(1989), 45 Ohio St.3d 219. Notwithstanding, more recently, inKimble v. Kimble, 97 Ohio St.3d 424, 2002-Ohio-6667, the Ohio Supreme Court found that public policy principles in earlier precedent, dictating that a person should not be required to continue to pay spousal support to an ex-spouse who has remarried, conflicted with and had been superceded by amended R.C. 3105.18. Id., at ¶ 8. The court concluded that, when a divorce decree does not provide for the termination of spousal support after the remarriage of a party, a trial court may terminate the support only when the decree contains an express reservation of jurisdiction. Thus, the court in Kimble made clear that a party's remarriage does not automatically terminate an award of spousal support. See Sutphin v. Sutphin, Hamilton App. No. C-030747, 2004-Ohio-6844, at ¶ 32 (Kimble makes clear that a party's remarriage does not automatically terminate an award of spousal support); Unger v. Unger, Brown App. No. CA2003-10-013, 2004-Ohio-7136, at ¶ 46 (pursuant to Kimble,
trial court did not err in refusing to terminate spousal support even though obligee remarried one year after the divorce).
 {¶ 49} Further, as the court in Sutphin noted, R.C.3105.18(B) provides for the termination of spousal support upon the death of the obligee but makes no mention of the effect of remarriage. Id., at ¶ 33. "`The legislature only provided [that] death, not remarriage or cohabitation, shall terminate spousal support unless the award expressly provides otherwise.'" Id., quoting Newman v. Newman, Licking App. No. 2003 CA 00105,2004-Ohio-5363, at ¶ 55. The fact that the legislature chose to provide a specific exception to the statute in the case of the death of the obligee, but did not provide an exception for remarriage of the obligee in its 1991 amendment to R.C.3105.18(B) supports a finding that remarriage of the obligee does not automatically terminate the obligor's duty to pay spousal support. McClusky v. Nelson (1994), 94 Ohio App.3d 746, 749, fn.1. For these reasons, the trial court in the present case did not err in failing to include a provision for termination of spousal support upon the remarriage of Dolores. However, because we have found that the trial court must reconsider spousal support upon remand, it is also free to reconsider this provision. Therefore, Carl's second assignment of error is sustained in part and overruled in part.
 {¶ 50} Carl argues in his fourth assignment of error that the trial court erred when it refused to find a de facto termination of the marriage as of the filing date of the current actions in June 2001, and utilizing the trial date as the termination date. R.C. 3105.171(A)(2)(a) establishes the presumption that the term "during the marriage" for purposes of the valuation of marital property is defined as being from the date of the marriage through the date of the final hearing. However, R.C.3105.171(A)(2)(b) provides that, if the court determines that use of that date would be inequitable, the court may select a date that it considers equitable for determining the division of marital property. Although there may be a de facto termination of the marriage prior to the date of the final divorce hearing, such termination must be clear and bilateral, not unilateral. Day,
at 158. Generally, trial courts use a de facto termination of marriage date when the parties separate, make no attempt at reconciliation, and continually maintain separate residences, separate business activities, and separate bank accounts. Eddyv. Eddy, Washington App. No. 01CA20, 2002-Ohio-4345, at ¶ 24, citing Gullia v. Gullia (1994), 93 Ohio App.3d 653, 666; Day,
at 158. Courts should be reluctant to use a de facto termination of marriage date solely because one spouse vacates the marital home. Id. Rather, a trial court may use a de facto termination of marriage date when the evidence clearly and bilaterally shows that it is appropriate based upon the totality of the circumstances. Id. A court's decision to use the date of the final hearing or a de facto date is discretionary and will not be reversed on appeal absent an abuse of discretion. Schneider v.Schneider (1996), 110 Ohio App.3d 487, 493.
 {¶ 51} In the present case, the trial court did not abuse its discretion in failing to find a de facto date of termination of the marriage that was earlier than the final hearing date. Dolores' testimony was that she moved from the marital residence with the parties' minor child due to Carl's excessive drinking at the home. She testified she believed she had to remove their daughter from a dangerous situation and would not have separated from him otherwise. See Reese v. Reese (May 22, 1997), Cuyahoga App. No. 71336 (public policy supports refusing to use a de facto termination date for the marriage when the wife and children are forced to leave the marital residence because of a hostile environment, as doing so would reward the husband for his abusive behavior toward his wife and children). Dolores testified that she did not wish to end the marriage at that time and only began to realize that the marriage was ending when Carl refused to move from his girlfriend's home. Dolores specifically testified that she was willing to reconcile with Carl if he would have left his girlfriend and given up alcohol, and admitted that she had not given up hope of saving the marriage as of the time she filed for divorce. Cheryl McClellan, a friend of Dolores' and Carl's, testified that Dolores wished to reconcile with Carl even after she filed her complaint for divorce. See Corbett v. Corbett
(June 1, 1999), Coshocton App. No. 98-CA-16 (when the termination of the marriage is not a joint decision, and one party holds onto the thought that the marriage should not end, there is good cause to use the date of the final hearing as the termination date). Further, portions of the parties' finances remained entangled until trial. Dolores remained a co-obligor on the mortgage for the marital residence, and on a substantial mortgage and note used to secure the 5542 Columbus Pike property. Carl also admitted he never attempted to divide his business interests with Dolores during their separation. See Gullia, at 666 (whether the parties have separated their business activities and other financial associations are appropriate factors for the trial court to consider when determining whether a de facto termination date should be found). For these reasons, we find the trial court did not err in refusing to find a de facto termination date of the marriage, and Carl's fourth assignment of error is overruled.
 {¶ 52} Accordingly, Dolores' first and fourth cross-assignments of error are overruled, and Dolores' second and third cross-assignments of error are sustained. Carl's first, second, and third assignments of error are sustained in part and overruled in part, and Carl's fourth assignment of error is overruled. The judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, is affirmed in part and reversed in part, and this matter is remanded to that court for further proceedings in accordance with law, consistent with this opinion.
Judgment affirmed in part and reversed in part, causeremanded.
Bryant and McGrath, JJ., concur.